v. Eyerly-Ball Community Mental Health Services, Et al. Mr. Ray Kemper, when you're prepared, please proceed. Good morning, your honors. May it please the court. Counsel, my name is Bobby Ray Kemper, and I have the privilege of representing Kent Payne, Leslie Payne, and the estate of Jordan Payne on this case. The whole point of mental health services is to protect and mitigate against the risk of suicide. That is especially true in jails, where since I believe it's 2000, suicide has been the leading cause of death. That is especially true in the Madison County Jail, where the leading cause of death has been suicide. On June 12th of 2020, Jordan Payne was in a clear mental health crisis while incarcerated at the Madison County Jail in rural Winterset, Iowa. He notified, and in fact his family came down and physically presented themselves at the sheriff's office and notified the sheriff's department that he was indeed in mental health crisis. Consistent with their long-term practice, and in fact their contractual agreements, Madison County reached out to Eyerly-Ball Community Mental Health Services, their contracted mental health provider for the jail. Consistent with past practice, Eyerly-Ball Community Mental Health Services sent Scott Thomas to the Madison County Jail to address the in-process mental health crisis of Jordan Payne. Scott Thomas is the only individual ever from Eyerly-Ball to attend to mental health needs at the Madison County Jail. Now, help me here, it seems that this is where the record gets fuzzy as to what service Mr. Thomas provided. Was he providing mental health service or was he providing this kind of, they called it kind of a diversion program service where it seemed to be more administrative or have an administrative component to it, a component of more social work than health care. And it just seemed a little fuzzy as to exactly what Mr. Thomas was obligated to do under the contract that his employer had with the facility. Which is absolutely why granting summary judgment was not appropriate in this case, because the scope of Mr. Thomas' duty, the scope of his undertaking, the scope of the contractual obligations were material disputed facts. If you look at the contract that they entered into, for short it's the CICS agreement, and then the regional loan management plan. The services that Eyerly-Ball was contracted to provide to the Madison County Jail far exceeded simple social work type things. It was mental health services. They were a licensed registered mental health provider in the state of Iowa. And if you look at Scott Thomas' written job description, it went way further than just scheduling people for services. His job, written job description involved a requirement that he assess individuals and then to facilitate and to actually provide direct care until the other care providers. Does the record show his professional qualifications for mental health assessment? It does, and the fact of the matter is he's not qualified to do that. And therein lies part of the problem. What Eyerly-Ball was doing is they are contracting with the jails to provide mental health services, but then sending a guy with a sociology degree who isn't qualified to do the task that he's assigned to do. Well, if his task that he's assigned to do is to assess the need for more professional, directly appropriate mental health, it would seem that's kind of what happened. He came in, he had a conversation, and we have the, I guess, kind of the major fact here of statements he made to facility personnel that this person's not, he's okay for today. But he also assessed enough to know this person needs professional help right away and put him on schedule to talk to a psychiatrist at the next available opportunity. Correct. Why would his responsibilities not have been satisfied by getting the detainee access to qualified professional medical care? Because whether he's satisfied his duty is a jury question. It's not for the court to determine as a matter of law. That is a factual dispute throughout this case is, one, to what extent was Mr. Thomas responsible? What all did he have to do? What all did Eyerly Ball, what services was Eyerly Ball required to provide? But to say that we can't as a matter of law say he fulfilled his duty under the dispute of facts in this case. Because he approached Jordan Payne in a custodial setting. He engaged in a relationship, an undertaking with Jordan Payne to assess him and assess his mental health needs. For 25 minutes, Jordan Payne sat there and disclosed what I don't believe anybody would need to be a trained professional to identify the elevated suicide risk that young man was communicating. He had psychosis. He had existing physical self-harm. He had lost appetite. He had hopelessness. He had nothing to live for. He flat out said it. And then he goes and he references seven separate suicide attempts. In fact, one of which was in the same very institution. So it doesn't take a trained professional to all you have to do. It's like we see in the airport. If you see something, say something. If you hear something, say something. What we're talking about here, what the crux of this case is, is whether or not there's a legal duty. The district court concluded there wasn't. The district court concluded there wasn't. And I believe that it was error for the district court to conclude that because in order to reach that, they had to resolve a material disputed fact, which is the scope of the responsibility of Mr. Thomas. The district court flat out concluded, even though it's disputed, that the only services provided was jail diversion. That's not the sole issue, or that's not the sole services that were being provided under the contract. The contract also required crisis management, basic crisis response, which under Iowa Code and under the Iowa Administrative Code requires a suicide risk assessment, an evaluation, but then also an initial screening. And what Mr. Thomas was doing in this situation is on all fours with an initial screening. And under the Administrative Code, an initial screening requires an assessment of lethality, suicide lethality and safety needs. And what he did here is he had all the information available. And he let Mr. Payne leave, go to a single isolated cell that was in no way suicide-proof, not even suicide-resistant. And he then made an affirmative communication to jail staff that Mr. Payne would be just fine, that he wouldn't harm himself while he was in custody. What did he know? What information did Thomas have to make the type of, take the type of action that you're suggesting should have been done? Sure. If you watch the multipurpose room video, you can see, and the district court found as a factual matter, taking the facts in the light most favorable to Mr. Payne, that at the time Mr. Payne is communicating with Mr. Thomas, he's agitated. He's animated. He's emotionally volatile. He's fidgety. He's restless. And he repeats and specifically informs Mr. Thomas he's lost everything, that he has had prior, numerous prior suicide attempts, one of which was in that jail. He talks about how he cut his wrist and ended up chained to the bed the last time he was there. He communicated a history of severe mental illness. He communicated psychosis, hearing voices telling him to chew out his veins in his arm. He communicated- How recent were all of these to that moment? Because this case has this interesting feature that 10 minutes after he leaves, the patient takes, or the detainee takes, acts against himself. Correct. Even though a professional has been requested to come, what was there that really would have enabled action that would have prevented what occurred? All Mr. Thomas needed to do was communicate. And he admits that that's part of his job, is to communicate with the jail, because the jail cannot- The communications that occurred in the multipurpose room are privileged medical- according to Mr. Thomas, they're covered by the medical privilege. He has them sign releases, but he himself conceded that communication with jail staff is important for him to fulfill his job, because if he does not give them the information, they have custody of Jordan. They can't take the action to protect- Does the record show how recent there had been a suicide attempt? I don't know of this particular summary judgment motion. There were two rounds. The earlier one does. But I believe the prior suicide attempt was a few years before. But it was in those records, and that all went into the deliberate indifference part of it that we're not here to talk about today. But as far as the communication, the psychosis, the self-harm, all of that happened in close proximity to when jail staff then called in Mr. Thomas, and Mr. Thomas then came down and met with Jordan in response to that. So it was a matter of minutes. I'll reserve the rest of my time, if I may, for rebuttal. Thank you. Thank you, Mr. Ray Kim. Mr. Moser? Thank you, Your Honor. My name is Joe Moser. I represent Scott Thomas and Eyerly Ball in this matter. Counsel, thank you for your comments. I'd like to start where plaintiff's counsel did and where the questioning focused, Your Honor. Plaintiff's opening statement was the whole point of mental health services is to prevent suicide. The undisputed facts are that Eyerly Ball and Scott Thomas did not provide mental health services to the jail, period. There was a discussion about the contract and the scope of the contract. The contract speaks for itself, Your Honor, and I encourage the court to read that. It begins at page, I believe, 111 and continues for about 24 pages in two segments. Within that, discussing the specific services provided by Eyerly Ball to the Madison County Jail, the only place the Madison County Jail appears is the jail diversion services. That's it. There are other services that are available to this multi-state region that entered into agreements where those counties can pool tax resources to fund programs for mental health. So, sure, Warren County, Iowa, Boone County, Iowa, Story County, Iowa can call on Eyerly Ball and request crisis intervention and management, can request social services, can request treatment and medication management. That does not apply here. It does not apply in the context of the Madison County Jail. That's also supported, Your Honors, by the answers to interrogatories, by the testimony of the program director, Mr. Thomas' supervisor, Monica Van Horn, and it's also supported by the invoice that's found at page 157 of the record. The only services paid for ever by the Madison County Jail are the jail diversion services. Scott, Thomas' One of the major issues here is duty, and one of the allegations plaintiff makes is that duty can be grounded on an undertaking and that Mr. Thomas, regardless of the contract, undertook to provide services of a mental health nature. What was the basis for him opining on the detainee's condition and potential for self-harm? I think that that is an important distinction, Your Honor, and we have to keep our eye on, if anything, was there a gratuitous undertaking and what was that undertaking? He says it's important to me to communicate with the jail, even if that's not part of my job duties in the jail diversion services, which is to meet with the inmates and connect them with an actual mental health provider if they need it and to secure tax payment for that. If that undertaking here is to communicate with the jail, as you yourself pointed out, didn't he discharge that duty? The record shows that he communicated exactly what Jordan Payne said to him in that meeting. I don't want to hurt myself here. I don't want to commit suicide generally, but I don't know what will happen when I get out. There is no dispute about that statement having been conveyed. And if anything, then, Your Honor, we can get into a termination of that duty analysis. As he's conveyed that, any duty, any undertaking to communicate with the jail has been discharged. The jail has reassumed custody control, its custodian relationship over Mr. Payne, its ongoing duties to ensure his safety and prevent his suicide and to regularly monitor him as it had been doing. The district court looked at the third restatement, Section 42. Was that appropriate? I think so, yes, Your Honor. In terms of viewing the undertaking, and that's the analysis that the Iowa Supreme Court has applied in multiple cases, including Jane and Foster. I saw where the district court did an analysis of Section A, which has to do with increasing the risk of harm. I didn't see any analysis of Section B, which is when the person to whom the services are rendering or another relies on the actors exercising reasonable care in the undertaking. It seemed to me that that could be applicable here to create a duty. I appreciate you pointing that out, Your Honor. I wondered the same thing. The court does actually get into that a little bit on pages 12 and 13 of its opinion and analyze that. I think that if you track and read 42 and Section 43, they mirror one another. They are similar to, I believe it's Section 323 and 324 of the restatement second. We can look to the analysis that the court provides in both Jane and Foster on reliance and what that dictates under the circumstances. The court does address that, and we address that in our briefing to this court at pages 41 to 47. I think where we can go there is whether or not there was actual reliance. That's one of the elements that's required. If we look to the record here on whether or not there was any reliance upon Mr. Thomas' communications with the jail, we can see that there is not. The record shows that the sheriff himself said, I don't know what more he could have said that would have changed anything. There was also no reliance upon him ensuring the safety of his inmate. Wouldn't it have been likely if Mr. Thomas had informed the jail that this was an immediate threat of suicide, that they would put him on suicide watch? Well, first and foremost, he does not have the power to do that. He has no power to direct or make recommendations to the jail. That remains the jail's exclusive job. Well, of course, but if he said, I perceive an immediate risk of suicide, most likely they would have put him on suicide watch. It's a possibility, Your Honor. We don't know that, and it doesn't prevent an issue or a bar to this court. It's also important that Mr. Let me ask this. Was the question ever asked of a jail official? Had you been told that it was an immediate risk? What would you have done? The sheriff says, I don't know what he could have said that would have changed anything. That's the sheriff's testimony. And, Your Honor, I think that it's important that when we look in this timeline of events, Mr. Payne has been in the jail for three days. He was arrested on June 9th. His suicide occurs on June 12th. He has been in jail after being held in contempt of court because he called a district court judge, Hefner, an effing retard. And the judge held him in contempt. He was arrested, brought in. The jail performed its own suicide assessment pursuant to its duties to do so. That suicide assessment is part of the court's record with his booking documents. I believe it's around page 40-ish of the appendix. In that, it shows a history of suicide, self-harm, drug use, etc. So that's nothing new to them. His mom, Jordan Payne's mom, is the cousin of one of the dispatchers. She calls in, says he's telling his girlfriend over CHIRP, which is text messaging available to the jail inmates funded by family members or those on the outside, that he has thoughts of hurting himself, that he's imagining chewing out his veins. That's all part of the record. The jail is well aware of that. The only information Scott has coming in is that Jordan Payne wants to talk to you. He comes in. He meets with him. He says, Jordan Payne told me that he doesn't want to commit suicide here, that he's not going to do anything here, but I don't know what will happen when he gets out. All of this other information that plaintiffs contend should have or could have been relayed is already in possession of the jail. In fact, they have greater knowledge because they were there for his last suicide attempts, which occurred in their custody before, which isn't new information or would, as Sheriff Barnes said, changed anything or made a difference. Okay. All of that may be true and may be a defense, but does it go to the question of whether there's a duty? Well, I think it goes to, in discussing the reliance aspect, Your Honor, which was how we got on to this question, is there has to be evidence that the jail reduced or neglected safety checks. Otherwise, there is no reliance and no liability as a matter of law. They have a recording that the jailer can observe Jordan Payne in real time. It's recorded. It's part of the record as well. They have him in a single cell for supervision. There's no indication of any change. As the district court analyzed, there's no increased risk of harm and no change. Your response to my argument about the lack of analysis on B is there's no material question of fact that the jail would have relied on, Thomas. Do I understand your argument right? I think that's accurate. I think we're saying the same thing, Your Honor. Counsel, help me clarify this or my understanding about this. I thought that the sheriff testified that he expected Thomas to assess inmates' mental health condition, including suicide risk, and that there was the assumption that Thomas would communicate risks to jail staff. Did the sheriff give that testimony? I believe that's an accurate reflection of a portion of his testimony. And then couple that with the testimony from Thomas in which he acknowledges things that he did not convey. That he did not tell jail staff that Payne had attempted suicide seven times, that he had a history of severe mental illness, that his current injury was causing him pain, that he was hearing voices, that he thought about eating his veins, that difficulty sleeping. What am I missing there? It sounds like a disconnect as I look at that. When you couple what the sheriff testifies as to expectations of what Thomas would communicate, and then Thomas' testimony that I didn't communicate much, much if anything. Thank you, Your Honor. That brings us back to the discussion of what is the duty? What's the actual duty here? And what is Scott Thomas required to do? We can look to the contract. We can look to the relationship between the parties. Again, his job here is to coordinate services and connect him with the mental health service. Isn't all of that just bound up in factual fact questions? No, Your Honor. And I think that that's where we talk about what is a genuine issue of material fact. And the issue is that it is undisputed that that is not part of his requirements. Although they may have hoped he would do that and that they liked communication and had anticipated that he would do so. And Scott himself says, I would convey those things. Maybe that's a gratuitous undertaking. And if he does, then we have other elements that we have to discuss, Your Honor. In this relationship, did Irelie Ball have responsibilities to the detainee that Thomas didn't? No, Your Honor. They did not. Irelie Ball's sole connection here is the employer of Scott Thomas and the director of the jail diversion program. They employed Scott Thomas to go to the jail to connect inmates with mental health services as a means to get them service while in jail and get them services upon their discharge from jail as a means to reduce recidivism. So any obligations Irelie had in relation to the detainee, whether those obligations came from statutes or restatement or whatever source contractual, they were relying on Thomas. Yes, Your Honor. So Thomas' actions or inaction would be attributable to them. Yes, Your Honor. That's accurate. And I see that I'm running out of time. What I would say, Your Honors, is that- Well, counsel, that is just up to the jury, regardless of what the terms of the contract. If actions of Thomas led, action or inaction, led jail personnel to decline to take certain precautions, why isn't all of that just jury questions as to whether that was reasonable on the part of jail personnel? Yes, Your Honor. There is no evidence that they failed or would have taken any alternative precautions. And that's part of that Section 43 reliance element that we were talking about, that there must be evidence that they reduced or neglected safety checks or means of intervention, and without that, there can be no liability as a matter of law. That's discussed in the Sankey decision, which I unfortunately don't have time to go into detail about. But for further discussion, I'd encourage the Court to review our briefing on pages 41 to 47 on reliance in Section 43. Thank you, Your Honors.  To answer your direct question about whether the direct question was asked, in his deposition, Sheriff Barnes was asked, quote, in other words, if he, meaning Thomas, identified concerning behaviors or concerning statements, especially those that may elevate or be considered elevated risk factors for Mr. Payne, would you expect those to be communicated to you and your jail staff? Barnes' answer was yes. Later on, Barnes was asked, had he been notified of Payne's elevated suicide risk, what action would he have taken? We'd put them in, put them under direct observation, put them in front holding cell where we have close with them, take away anything they can hurt themselves with, put them in a suicide smock, stuff like that. That's reliance. That's what they would have done had they been notified, as was Thomas' job. And whether it's via contract or whether it's via an undertaking, Thomas had that minimal duty. We're not asking a lot of them. And I would be concerned with the fact, also, that if Irie Ball owes no duty and if Thomas owes no duty, small town law enforcement agencies trying to maintain jails can't rely on the people they contract with to provide services. They're 100% liable and they're 100% responsible to provide statutorily required and constitutionally required medical care and mental health care. That's not what the system is set up. Whether it's one restatement section or multiple statement restatements, the real question is whether or not there is a strong policy consideration or a strong principle that excuses an entire class of defendants from having a duty of care. A duty is the default. Exemption is the exception. And they haven't pointed out any good reason why there shouldn't be a duty here. And I would also point out that the best – and I have to apologize. And next time Judge Rose sees me, she can kick me for not citing the restatement third sections. And more importantly, from the restatement second, 324A. And then the third is 43, which is as a duty when you undertake a duty for the safety of a third person. I got hooked up or hyper-focused in Jane on the 323 and then the section 42. But those other restatements are much more applicable. It's the same policy considerations. It's the same legal analysis that goes into it, which is, one, if it's your job, it's your job. Number two, if you say you've got it, you've got to have it. And that's what we have here. We have, whether it's in his contract or not, but I would point out that on Thomas's written job description, he meets with incarcerated individuals to assist mental health professionals in determining physical and mental health needs. He himself flat out said to the Department of Criminal Investigation, it's appendix page 455, it's a routine part of my job to come to this jail on a regular basis to meet with all inmates that stay here more than a day or two to do a mental health screen and to assess them for needs for services. The need for services of Jordan Payne on June 12th of 2020 was to have somebody watch him just a little bit closer, was to have somebody take the time to pay attention to a young man who was at the most elevated risk of suicide that anybody could possibly imagine. That's all they needed to do. But yet, unfortunately and tragically, Mr. Thomas, after hearing all of those facts come from Mr. Payne, communicated to the jail, regardless of how it was made or what the exact words were, communicated to jail staff, leading them to believe he was not a risk at self-harm. Eleven minutes later, he was tragically wrong. So for those reasons, we would ask that the summary judgment grant be reversed. Thank you. Thank you, Mr. Ray Kemper. Thank you also, Mr. Moser. Court thanks both parties for your participation and argument before us. We'll continue to study the matter and render decision. Thank you.